# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-1969

_____

United States of America

*Plaintiff - Appellee*

v.

Tavares Montgomery

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Waterloo

_____

Submitted: April 13, 2018
Filed: July 23, 2018

_____

Before SMITH, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

After serving a sentence for being a felon in possession of a firearm, Tavares Montgomery began serving three years of supervised release. The U.S. Probation Office filed a petition to revoke supervised release, alleging that Montgomery had violated many conditions, including use of controlled substances. After a hearing, the

district court[1] revoked supervised release and sentenced Montgomery to seven months in prison. He appeals, arguing the court violated his right to confront witnesses when it admitted transcripts of a drug-testing expert's testimony in prior cases. Reviewing for abuse of discretion, we affirm.

In March 2017, the Probation Office petitioned to revoke Montgomery's supervised release. At an April 11 revocation hearing, Montgomery admitted providing a urine sample on March 22 that tested positive for cocaine. He also admitted using cocaine on March 18, drinking a "blocker" in an unsuccessful attempt to thwart the March 22 urine analysis, and being placed on a sweat patch[2] program on March 30. Accepting Montgomery's representation that he last used cocaine on March 18, the district court adopted the Probation Office's recommendation to modify rather than revoke supervised release and imposed a 120-day home monitoring condition. But the court warned Montgomery:

> Now, there's a pending sweat patch. I am assuming . . . that you are representing to this Court that that is going to be a negative for drugs. If it is not going to be, now is the time to tell me, because if we get that sweat patch back and it's positive for drugs, you will go to prison.

On April 12 and April 19, the Probation Office filed supplements to its previous petition to revoke, alleging three additional violations: (i) failure to participate in substance abuse testing, based on Montgomery's admission that he used a "blocker" before providing his March 22 urine specimen; (ii) use of controlled substances, based on analysis of two sweat patches he wore between March 30 and

---

[1]The Honorable Linda R. Reade, United States District Judge for the Northen District of Iowa.

[2]A sweat patch is a drug-testing device that absorbs the wearer's sweat; after water in the sweat evaporates, any drugs remain in the absorbent pad for analysis. United States v. Meyer, 483 F.3d 865, 866 (8th Cir. 2007).

April 10; and (iii) failure to truthfully answer inquiries, based on his representation at the April 11 hearing that he had not used controlled substances after March 18. Montgomery admitted the first violation but denied the other two.

At the revocation hearing, the government introduced without objection four exhibits containing lab analyses of Montgomery's sweat patches, and documents establishing the credentials of the officers who applied and removed the sweat patches and their chain-of-custody during the testing process. Probation Officer Amy Moser testified in support of the petition to revoke. Moser testified that Montgomery was placed in the sweat patch program on March 30 at a residential reentry center, where trained officers applied and removed the sweat patches. Moser explained that, after a sweat patch is removed, it is sent to the Clinical References Laboratory for an initial screen for controlled substances, which, if positive, is confirmed by a second test. The lab analyses reported that the patch Montgomery wore from March 30 to April 6 tested positive for cocaine and THC (the metabolite for marijuana). The patch contained over five times the minimum detection value for cocaine. The patch he wore from April 6 to April 10 tested positive for THC but not for cocaine.

Montgomery had provided a urine specimen on March 22 that tested positive for cocaine and another on March 24 that tested negative for controlled substances. Based on her training and familiarity with enforcing drug testing requirements, Officer Moser testified that cocaine can be detected in urine only if the cocaine use occurred twenty-four to forty-eight hours before a sample was taken. Therefore, Officer Moser opined, (i) Montgomery's March 18 cocaine use would not have caused the positive cocaine test on a sweat patch applied on March 30 and removed on April 6, and (ii) the two positive THC sweat patch tests resulted from THC ingested after March 24, while Montgomery was wearing the patches.

Moser testified that she had discussed the sweat patch test results with Dr. Leo Kadehjian, a California toxicologist who is a consultant to the Administrative Office

-3-

of the U.S. Courts. Over Montgomery's objection, Moser testified that Dr. Kadehjian advised that research would not support the proposition that a cocaine-positive test from the March 30 to April 6 sweat patch resulted from Montgomery's March 18 cocaine use. On cross-examination, asked if a substance other than marijuana, such as hemp seeds, could have triggered the THC-positive tests, Officer Moser replied that both the parent drug and metabolic drug were present in Montgomery's sweat patches, suggesting that marijuana was the source of the THC. Moser testified that Dr. Kadehjian advised that the FDA prohibits hemp seeds and hemp oil sold in the United States from containing THC.

After Officer Moser testified, the government offered the evidence at issue on appeal -- transcripts of Dr. Kadehjian's lengthy testimony in two prior Northern District of Iowa cases addressing in detail the reliability and acceptance of sweat patches for drug testing, and explaining how sweat-patch testing differs from other forms of drug-detection testing, such as urine and hair tests. The government did not advise the district court, and subsequently did not explain on appeal, the purpose for which this testimony was offered. Overruling Montgomery's confrontation and hearsay objections, the district court admitted the prior testimony after balancing the cost of making Dr. Kadehjian available for cross examination against the reliability of his proffered testimony.

Montgomery then testified and denied using cocaine after March 18. He theorized that the "blocker" he took before providing his March 22 urine specimen explained why his March 24 urine specimen tested negative for cocaine. He also testified that hemp seeds he takes for their health benefits were the likely source of the THC found in his sweat patches. The district court found Montgomery's explanations not credible, revoked his supervised release, and sentenced him to seven months imprisonment and two years supervised release.

On appeal, Montgomery argues the district court erred in admitting into evidence two transcripts of testimony by an expert witness who was not available for cross-examination. "[A] defendant contesting revocation is entitled to 'the minimum requirements of due process,' including 'the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation).'" United States v. Simms, 757 F.3d 728, 731 (8th Cir. 2014) (quotation omitted). Similarly, Rule 32.1(b)(2)(C) of the Federal Rules of Criminal Procedure provides that, at the revocation hearing, the defendant "is entitled to . . . an opportunity to . . . question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." The district court "must balance the probationer's right to confront a witness against the grounds asserted by the government for not requiring confrontation." United States v. Bell, 785 F.2d 640, 642 (8th Cir. 1986); see United States v. Protsman, 829 F.3d 978, 981-82 (8th Cir. 2016); United States v. Harrison, 809 F.3d 420, 423-24 (8th Cir. 2015).

The first transcript at issue recorded Dr. Kadehjian's June 2006 testimony to the district court in Meyer, where he "testified that the sweat patch was a scientifically reliable device" and "explained how Meyer's negative urine results and positive sweat patch results could be reconciled." 483 F.3d at 867. On appeal, placing weight on Dr. Kadehjian's expertise, we "join[ed] the other courts that have previously determined that sweat patch results are a generally reliable method of determining whether an offender has violated a condition of his or her probation." Id. at 869. However, we cautioned:

> There may well be certain instances where offenders offer compelling reasons to believe that positive test results from sweat patches are erroneous. District courts should make such determinations on a case-by-case basis.

Id. Meyer argued his negative urine samples demonstrated the district court erred in revoking probation. We noted that "Dr. Kadehjian offered a sensible explanation of how these seemingly differing results could in fact be reconciled." Id. at 870.

Here, the government's case started with the holding in Meyer that sweat patch results are "generally reliable" unless defendant offers "compelling reasons to believe" they are erroneous. The government introduced documents establishing the sweat patch results and the reliable way the sweat patches were handled, to which Montgomery did not object, and Officer Moser's testimony interpreting the sweat patch results. Unless rebutted, this evidence was sufficient to establish by a preponderance of the evidence that Montgomery violated conditions of supervised release by using controlled substances after March 18. Dr. Kadehjian's prior testimony regarding the general reliability of sweat patch testing was cumulative and unnecessary, so any error in admitting it was harmless. Montgomery's assertion that removing Dr. Kadehjian's testimony "would leave no basis" for the court's revocation decision is factually without merit.

Montgomery attempted to show that *his* sweat patch tests were unreliable because the "blocker" explained why his March 24 urine test was negative for cocaine and his consumption of a health food containing hemp seeds explained the presence of THC in his sweat patches. The government did not offer Dr. Kadehjian's *prior* testimony to refute Montgomery's theories nor rely on any portion of that testimony for that purpose. Defense counsel argued to the district court that he would like to cross examine Dr. Kadehjian about "comparing sweat patch and urine testing." But the district court need not impose on the government the "inordinate" burden and expense of producing a California expert so that defense counsel can conduct a fishing expedition beyond the scope of the government's direct examination. Bell, 785 F.2d at 643. Montgomery was free to retain his own expert to explore whether his cocaine "blocker" theory might have scientific support.

-6-

Unlike the prior testimony at issue, Officer Moser's testimony relating what Dr. Kadehjian said when they discussed Montgomery's sweat patch test results was directly relevant hearsay, offered to prove the truth of the expert's statement that cocaine Montgomery used on March 18 would not continue to be excreted and detected by a sweat patch he began wearing on March 30.[3] Montgomery did not focus on this issue in the district court and does not raise it on appeal. If properly raised and supported, the issue might have persuaded the government it did not need Dr. Kadehjian to support Moser's experience-based opinion. Or it would have required the district court to balance the reliability of this specific opinion against the burden of producing Dr. Kadehjian for cross examination in the Northern District of Iowa, live as at the June 2006 revocation hearing in Meyer, or by video conferencing from the Northern District of California, as Dr. Kadehjian testified in a July 2016 revocation hearing in United States v. Devos, 692 F. App'x 310 (8th Cir. 2017).

For this reason, our decision that the district court did not abuse its discretion in this case should not be taken as a blanket ruling that Dr. Kadehjian never has to be produced for cross examination when his opinion is offered to support sweat patch test results at a supervised release revocation hearing. Compare Simms, 757 F.3d at 732-33; United States v. Martin, 371 F.3d 446, 448-49 (8th Cir.), cert. denied, 543 U.S. 1004 (2004). No doubt, it would be impractical and inordinately expensive to require presentation of live expert testimony to support sweat patch lab test results at every supervised release revocation hearing. But the issue must be determined "on a case-by-case basis." Meyer, 483 F.3d at 869.

The judgment of the district court is affirmed.

_____

---

[3]Officer Moser's hearsay testimony also included a statement by Dr. Kadehjian that the FDA prohibits sale of health foods made with hemp seeds or hemp oil that contain THC. Presumably, if challenged, the government could have established this regulatory fact by judicial notice.