# IN THE COURT OF APPEALS OF IOWA

No. 19-1170
Filed September 11, 2019

**IN THE INTEREST OF S.B. and R.B.,**
**Minor Children,**

**S.B., Father,**
        Appellant,

**K.B. and R.B., Intervenors,**
        Appellants.
_____

Appeal from the Iowa District Court for Polk County, Colin J. Witt, District Associate Judge.


The father and the intervenors separately appeal the permanency-review order returning the children to the care of their mother.  **AFFIRMED ON BOTH APPEALS.**

Bryan Webber of Carr Law Firm, P.L.C., Des Moines, for appellant father.

Edward Fishman, Adel, for appellants intervenors.

Kimberly Graham, Indianola, for appellee mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for State.

Brent M. Pattison of Drake Legal Clinic, Des Moines, guardian ad litem for minor children.


Considered by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**BOWER, Judge.**

The father and the intervenors, the paternal grandparents, separately appeal the June 28, 2019 permanency-review order in which the juvenile court returned the children—S.B., born in September 2014, and R.B., born in May 2017—to the custody and care of their mother. We affirm on both appeals.

We review child-in-need-of-assistance (CINA) proceedings de novo. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). "Although we give weight to the juvenile court's factual findings, we are not bound by them." *Id.*

This family came to the attention of the juvenile court in 2017 when the mother and R.B. tested positive for methamphetamine after R.B.'s birth. The mother admitted using methamphetamine and consuming alcohol during her pregnancy. During the course of the following child-abuse assessment, the father tested positive for methamphetamine through a hair-stat drug screen. The family also had a history of involvement with the department of human services (DHS) for domestic violence issues. In July 2017, the mother contacted DHS stating she and the father got into a physical altercation on the evening of July 18, which the paternal grandparents confirmed.

The children were adjudicated CINA in August 2017, with case plan recommendations to address substance abuse, domestic violence, and the mother's mental-health issues. The children were placed in the custody of DHS and in the care of the paternal grandparents. Family safety, risk, and permanency (FSRP) services were provided to the family. Both parents participated in substance-abuse treatment. The mother participated in individual therapy for

anger, domestic violence, and post-traumatic stress. The father completed a mental-health evaluation and no treatment was recommended.

A November 2017 CINA review order confirmed the children were CINA.

In early 2018, both parents provided drug screens that were positive for methamphetamine. The mother had a sweat-patch screen that tested positive in January 2018. She denied any use and claimed her patch was positive because the father was using near her. A urinalysis (UA) screening was requested in April 2018 from the father "when behavioral indicators were reported." The UA was negative for substances. However, in May, a hair-stat test was requested from the father after a domestic incident between the parents and a report the father had a methamphetamine pipe in his possession at the time. The father's hair-stat screen was positive for methamphetamine and a sweat-patch screen was positive for methamphetamine and amphetamines.

A permanency hearing was held on June 7, 2018, at which time the court noted the permanency goal "remains reunification with parent(s)." The court granted the parents a six-month extension, finding the need for the children's removal would be eliminated upon the following: "the parent engaged in recovery/abstinence"; "no domestic violence, parents not in relationship"; and "stability can be provided in home of parent at minimal level." The children remained in the care of the paternal grandparents. The parents reported they were no longer in a relationship.

In August, the father completed outpatient substance-abuse treatment. But, on August 30, he was arrested for operating while intoxicated and a new substance-abuse evaluation was recommended.

There were two reported physical altercations between the parents at the family home in the beginning of September 2018.

A November 19, 2018 DHS report to the court noted the mother had been participating in inpatient substance-abuse treatment at Clearview Recovery since September 24. DHS recommended a trial home placement for R.B. and S.B. with the mother "contingent on her remaining at Clearview until she obtains independent housing." The concurrent plan for the children was placement with the father.

On December 3, the juvenile court entered a CINA permanency order conditionally returning the children to the mother. The mother remained in the Clearview treatment program until housing became available in February 2019. She moved into an apartment and continued to attend intensive outpatient substance-abuse treatment and participate in mental-health counseling. DHS continued to collect drug screens from the parents. A review hearing was set for March 5, 2019. The DHS report prepared for the review hearing summarized what was needed for permanency:

> In order to achieve safe case closure, [the mother] will need to continue to demonstrate that she can provide the children with a safe and stable environment free of substance abuse and domestic violence. [She] will demonstrate this by continuing to meet her mental health needs and gaining insight into how not meeting her mental health needs affects her ability to parent and leads to further substance abuse and domestic violence. [The mother] will successfully complete the program at Clearview and follow any recommendations. [She] will continue to engage in a lifestyle of recovery and gain long-term supports so that she can remain sober and clean long-term for the sake of herself as well as the children. [The mother and father] will address their communication and anger issues through therapy so they can co-parent safely and effectively.

In the event the children could not remain with the mother, the concurrent plan was placement with the father. DHS reported:

> In order for the children to be placed with [the father] he would need to demonstrate the ability to provide a safe and stable environment for the children. He would demonstrate this by successfully completing aftercare and following any recommendations, remaining active in the recovery community, abstaining from the use of alcohol and any illegal substances, and meeting his mental health needs through therapy and medication management as recommended.

A family team meeting was held on April 2. The father reported having housing, transportation, and a driver's license, but he was unemployed. He reported attending Narcotics Anonymous meetings and substance-abuse after care. The mother was working full time, had housing, a car, and a driver's license. She was continuing to attend Clearview substance-abuse programming and weekly mental-health therapy sessions. The family team meeting notes indicate the mother had a "dirty patch" in March 2019 but also had two clean UAs while wearing the patch: "There were concerns that the patch was dirty because of a bed she received from a friend, who received that bed from a friend known for using drugs. She needs a new bed. She needs to continu[e] with current services in place and attend[ ] meetings." Upon receipt of the results of the mother's positive sweat patch, the children were placed with their father pursuant to a safety plan.

A June 13 status order noted the "[n]ext hearing is scheduled in approx[imately] two weeks as a contested permanency hearing and the court will make a custodial decision at that time."

On June 28, a permanency-review hearing was held. The mother testified she had not used methamphetamine in March and had obtained UAs at her own expense, which tested negative. Both the mother's treatment provider at

Clearview and her long-term therapist Kevin Brown, who is also a licensed substance-abuse counselor, provided reports to the court that the mother did not have behavioral indicators of use. Brown testified he was aware of the two negative urine drug tests while the mother was wearing the sweat patch and he believed the patch result was a false positive.

After evidence was presented, the court ruled the children should be returned to the mother's care. With regard to the March 2019 sweat patch, the juvenile court stated:

> Now, moving onto the spring of 2019. I know what the case law says about sweat patches.[1] I believe they are indicators of use. They do have a more likely than not type reliability, but in my general knowledge and in my education, it's not an insignificant possibility that they have—can have false/positives. And I'm convinced that there are environmental factors and other ways there can be a false positive[ ]. And what I have said to the department leadership multiple times, I have said to others, a positive sweat patch demands an immediate UA, same day. It demands that. And that's how you get confirmation. And you shouldn't keep it on for two weeks. I think a short period of time for sweat patch is more important if we keep in that four-day window of use and then provide a UA. So I don't know. I'm not make a finding that [the mother] relapsed. I know there's a possibility of that, but what I'm focused on is . . . can the children safely be in her care today? My assessment is they can. And so we're going to go back to that.

The court noted it was being guided by its December 2018 ruling and "whether I can place these children in the mother's care, and I can." The court

---

[1] We observe courts have found that sweat-patch tests are a generally reliable method for determining drug use. *See United States v. Meyer*, 483 F.3d 865, 68–69 (8th Cir. 2007) (collecting cases). However, as noted by the *Meyer* court,

> That is not to say, of course, that positive sweat patch results are invariably a reliable indicator of drug usage. There may well be certain instances where [persons testing positive] offer compelling reasons to believe that positive test results from sweat patches are erroneous. District courts should make such determinations on a case-by-case basis.

483 N.W.2d at 869.

also ordered the children would be in the father's care every other weekend and one night per week in July and August, and indicated it intended to close the juvenile case in September. The court informed both parents, "I think you're both very capable parents, as long as you're clean, and I'm very proud of both of you."

On appeal, the father and the intervenors contend the juvenile court erred in not finding the mother had relapsed on methamphetamine when her sweat patch tested positive for methamphetamine in March 2019. The appellants argue the children should have been allowed to remain in the father's care because he has demonstrated a longer period of sobriety without having positive drug screens. The mother responds she provided two negative UAs around the time of the patch, the result of which the mother asserts was a false positive. She points out neither the State nor the guardian ad litem have appealed or joined in the appeal.

On our de novo review, we observe an experienced judge of the juvenile court—who has been involved with this family for two years—determined both parents had made substantial progress in addressing their domestic violence, mental-health, and substance-abuse issues. The court considered the negative UAs provided by the mother, as well as the testimony of the mother's therapist and her sister, who both testified that at the time the mother's patch tested positive the mother was exhibiting no indicators of substance use. The court found both parents were capable of caring for their children at the time of the permanency-review hearing and determined the children could be returned to the mother, from whom the children had been removed. We find no reason to disturb the juvenile court's ruling and we therefore affirm.

**AFFIRMED ON BOTH APPEALS.**