# IN THE COURT OF APPEALS OF IOWA

No. 23-0092
Filed March 29, 2023

**IN THE INTEREST OF A.B.,**
**Minor Child,**

**A.B., Mother,**
　　Appellant.
_____

　　Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, District Associate Judge.

　　A mother appeals the termination of her parental rights to her child. **AFFIRMED.**

　　Mark D. Fisher, Cedar Rapids, for appellant mother.

　　Brenna Bird, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

　　Kimberly A. Opatz of Linn County Advocate, Inc., Cedar Rapids, attorney and guardian ad litem for minor child.

　　Considered by Bower, C.J., and Badding and Buller, JJ.

**BADDING, Judge.**

In the face of positive tests for methamphetamine and marijuana—for herself and her child—the mother denied having a "drug problem." Her denials amid continued positive tests led the juvenile court to terminate her parental rights to the child, born in 2019, under Iowa Code section 232.116(1)(h) (2022). The mother appeals, challenging each of the steps in our termination framework—though her focus is on the reliability of her sweat patch test results.

## I.      Background Facts and Proceedings

In January 2022, the mother brought the child to an emergency room in acute respiratory failure. He was observed to be toxic-appearing with an ashen gray color. The child's urine screen was positive for marijuana. He was transferred to a nearby hospital where hair testing showed systemic exposure to methamphetamine and THC through ingestion or inhalation, along with environmental or passive exposure to cocaine and cannabinoids.[1] The mother's hair test was also positive for methamphetamine, yet she denied any use.

Instead, the mother theorized the child's exposure to multiple drugs was from a thirteen-year-old babysitter, the mother's ex-boyfriend (although he did not live with her or the child), or drugs the child was given in the ambulance or at the hospital (which was ruled out by the hospital). As for her own positive test, the mother thought that it could have been from someone putting methamphetamine in her drink or sprinkling it on a pizza she had ordered.

---

[1] The level of methamphetamine present in the child's body was 25,458 pg/mg, with "native THC" at 4307 pg/mg. To put those numbers into perspective, the testing cut-off level for methamphetamine was 100 pg/mg and 40 pg/mg for native THC.

The child was discharged from the hospital in early February, removed from his mother's care, and placed into foster care where he has since remained. He was adjudicated as a child in need of assistance in April. The mother consistently participated in supervised visits, completed a substance-abuse evaluation, and was successfully discharged from extended outpatient treatment in July. She had suitable housing, reliable transportation, and stable employment. And she had a strong bond and positive interactions with the child.

But the mother could not consistently provide negative drug screens. Five of her sweat patch tests were positive for methamphetamine and amphetamines, while ten were positive for THC. She also had positive urinalyses for marijuana metabolites, though many of those came after she obtained a medical marijuana card in July to treat her recently-diagnosed anxiety. Yet the mother maintained that she did not use any illegal substances. To combat what she said were false-positive sweat patch tests, the mother submitted to urine tests every Monday, Wednesday, and Friday at her substance-abuse treatment facility, where she participated in a continuing care program. But even those were positive for THC at what the mother's case manager with the Iowa Department of Health and Human Services said were high levels. And she also began testing positive for alcohol.

The mother's lack of "accountability for what happened [to the child], how it happened or how she contributed to it," led the department to recommend termination of her parental rights. The State filed a petition in September. In a report to the court before the termination hearing in December, the department's case manager summarized her concerns:

> [The mother] has continued to deny any use of illegal substances. She continues to report she only uses her medical marijuana. She continues to test positive for methamphetamine. [The mother] also provided multiple [urinalyses] . . . that were positive for alcohol, but she doesn't see this as an issue since alcohol is not "part of her case." [The mother] becomes aggressively defensive and argumentative when trying to discuss anything with her. She asks what she needs to do to move forward and [the case manager] advises she needs to be substance free, and she argues that she is and her [urinalyses] "cover her". . . .
>
> [The mother] has spent so much time being dishonest and trying to hide things during this case that it has been impossible to move forward . . . .

The case manager concluded that although the mother is bonded with the child, "the safety risks are so significant that the need for safety outweighs any bond."

The juvenile court agreed after hearing the parties' evidence, ruling: "At trial, [the mother] maintained her position that she does not use illegal substances, and her alcohol consumption is minimal. . . . She was completely unable to take any accountability and, therefore, it would be unlikely that she can make any lasting change." The court terminated the mother's parental rights under Iowa Code section 232.116(1)(h). The mother appeals.[2]

## II. Analysis

We review termination proceedings de novo. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022) (noting that in conducting our de novo review, we "give weight to the [court's] factual findings but are not bound by them"). In performing that review, we apply a three-step analysis that asks whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a statutory exception applies and should be exercised to

---

[2] The father's rights were also terminated. He has not appealed.

preclude termination. *See id.*; *see also* Iowa Code § 232.116(1)–(3). The mother challenges each of these steps.

### A.     Ground for Termination

For her challenge to the statutory ground for termination, the mother only contests the State's proof of the final element of section 232.116(1)(h)—that the child could not be returned to her custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h)(4); *see also In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (examining whether there is clear and convincing evidence that "at the time of the termination hearing, the child could not be safely returned" to the parent's custody). In arguing that the child "could have and should have been returned" to her, the mother points to her urine tests, which were negative for all substances "other than marijuana, for which she has a medical marijuana card, and alcohol, which was not an issue in the case and has not been linked to safety concerns."

To accept this argument, however, we would have to ignore the mother's six positive tests for methamphetamine. One of these positive results was from a hair test at the beginning of the case. The other five were from sweat patches. At trial, the mother testified to her belief that the negative urinalyses were more reliable than the sweat patch tests. But she had no explanation for why the patches were positive, testifying: "It's just disappointing, because I haven't touched anything. I don't know. And I wish that I could fix it. I would." As for the child's positive drug tests, the mother continued to blame them on improbable sources, insisting: "[I]t wasn't from me doing anything around my son."

Our court has said "that sweat-patch tests are a generally reliable method for determining drug use," though there may be "certain instances where [persons

testing positive] offer compelling reasons to believe that positive test results from sweat patches are erroneous." *In re S.B.*, No. 19-1170, 2019 WL 4301591, at *3 n.1 (Iowa Ct. App. Sept. 11, 2019) (quoting *United States v. Meyer*, 483 F.3d 865, 68–69 (8th Cir. 2007)); *accord In re K.T.*, No. 21-0670, 2021 WL 3075733, at *3 n.4 (Iowa Ct. App. July 21, 2021); *In re A.C.*, No. 20-0736, 2020 WL 4516075, at *2 (Iowa Ct. App. Aug. 5, 2020); *In re A.W.*, No. 18-0382, 2018 WL 2084913, at *2 (Iowa Ct. App. May 2, 2018). The mother has not offered *any* reasons, let alone compelling ones, to believe her five positive sweat patch tests were erroneous. *See United States v. Jittaphol*, 598 F. Supp. 3d 22, 33 (D. Mass. 2022) (recognizing that while "there is a risk that a single positive sweat patch result may be false, it is less likely that two tests will result in false positives").

The mother's negative urine tests do not change our mind because, as the juvenile court found, they were "unobserved and certainly not random, [and] therefore, of little value in determining her sobriety." *See Meyer*, 483 F. Supp. 3d at 870 (noting the possibility for "individuals to escape urinalysis detection through any number of devices and methods"). In addition, the department's case manager testified that in her experience, sweat patch tests "are more sensitive. . . . [T]hey need a lesser amount to be positive . . . based on their different testing mechanisms." And she explained that sweat patches test for a longer period of use than urinalyses: "methamphetamine goes through your system regarding urinalysis testing very quickly."

We have also considered allegations of the mother's methamphetamine use before this case began, including the mother's positive test for cannabis and methamphetamine when the child was born, an unconfirmed report to the

department in July 2021 that the mother was using methamphetamine while caring for the child, and observations by the child's daycare provider that led her to "wonder[] if the mother is on drugs sometimes." With this history, the juvenile court "was rightly concerned about [the mother's] lack of insight into the danger that her methamphetamine addiction posed" to the child—a danger that was realized by his hospitalization at the start of this case. *See K.T.*, 2021 WL 3075733, at *3. While the mother had some periods of sobriety, "we cannot overlook her persistent denial of addiction," not just to methamphetamine but to marijuana and alcohol as well. *See id.*

Although the mother had a medical marijuana card for an anxiety diagnosis in July, she did not obtain a mental-health evaluation until just before the termination hearing. And she had no intention of participating in therapy because she felt her anxiety was completely controlled with the "cannabis, the THC." The department, however, suspected she was using "regular old marijuana" given her high test levels and her house smelling like marijuana, which the mother tried to blame on a dead mouse under her couch. As for the alcohol, the mother testified that she "barely drink[s]," despite six positive urinalyses for alcohol and a past conviction for operating while intoxicated.

Given the harm the mother's unaddressed addiction already caused the child, her refusal to accept any responsibility for that harm, and her unabated use of substances, we find clear and convincing evidence that the child could not be safely returned to her custody. *See In re L.F.*, No. 21-1760, 2022 WL 469596, at *2 (Iowa Ct. App. Feb. 16, 2022) (finding a child could not "be returned safely to the parents at present with their history of exposing children to methamphetamine

and their continued refusal to take any responsibility for this child's exposure before birth").

## B. Best Interests and Statutory Exception

Highlighting the positives—her housing, stable employment, reliable transportation, and consistent visitation—the mother claims termination was not in the child's best interests. She argues that the child is "bonded with her and, other than the allegation that [she] has used illegal substances, there does not appear to be any serious concern regarding [the child's] safety."

The defining elements of a child's best interests are safety and need for a permanent home. *See In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011); *see also* Iowa Code § 232.116(2) (giving "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child"). As discussed above, we are not dealing with *allegations* of substance use but instead multiple positive tests for methamphetamine, marijuana, and alcohol. The mother has already demonstrated the child is not safe in her care, and she has done nothing to change that situation with her continued insistence that she has "not touched meth" or "been around anyone using." *See In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (considering a parent's refusal "to acknowledge any illegal drug use despite strong evidence to the contrary" in assessing a child's best interests). This, coupled with the child's developmental growth and comfort in his foster home, convinces us that termination of the mother's parental rights is in his best interests.

As for the permissive exception cited by the mother, Iowa Code section 232.116(3)(c) authorizes the court to forgo termination when it "would be detrimental to the child . . . due to the closeness of the parent-child relationship." *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (noting the application of a statutory exception to termination, if one exists, is "permissive, not mandatory" (citation omitted)). We agree the record shows a loving connection between the mother and her child. Yet we must give greater weight to the child's safety and need for a permanent home, which are best served out of the mother's care given her unresolved substance-abuse issues. *See H.S.*, 805 N.W.2d at 748.

## C.     Additional Time

Buried within her requested relief, the mother suggests that we should "extend the time for reunification by six months." *See* Iowa Code §§ 232.104(2)(b); .117(5). But she provides no substantive analysis or supporting authority for this request. *See* Iowa R. App. P. 6.903(2)(g)(3); *L.N.S. v. S.W.S.*, 854 N.W.2d 699, 703 (Iowa Ct. App. 2013). Even if she had, there is no evidence the need for removal would no longer exist at the end of an extension because of her insistence that she does not have a "drug problem." *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) ("[T]he juvenile court may deny termination and give the parent an additional six months for reunification only if the need for removal 'will no longer exist at the end of the additional six-month period.'" (quoting Iowa Code § 232.104(2)(b)); *see also In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Given [the father's] past performance we are not convinced additional time or services will change him.").

For these reasons, we affirm the termination of the mother's parental rights.

**AFFIRMED.**